QUESTECH, INC., Plaintiff,

v.

HARTFORD ACCIDENT AND INDEMNITY COMPANY, Defendant.

Civ. A. No. 88–1184–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

June 1, 1989.

---

Norman H. Singer, Robert A. Rich, Sundlun, Scher & Singer, Washington, D.C., for plaintiff.

Alfred F. Belcuore, Montedonico & Mason Chartered, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

Significant ERISA[1] issues underlie this apparently straightforward dispute over the insurance proceeds from an accidental death and dismemberment policy. The policy was issued by defendant, Hartford Accident and Indemnity Company ("Hartford"), and purchased by plaintiff, QuesTech, Inc. ("QuesTech"), for one of its key employees. QuesTech was designated as the sole beneficiary of the employee's accidental death benefits. The key employee died in a car accident and QuesTech claimed entitlement to the policy benefits. Hartford denied QuesTech's claim. QuesTech responded by filing this suit.[2] Resolution of the benefits dispute turns, in part, on the threshold question whether the policy in question is governed by ERISA. This issue was first raised in Hartford's motion for summary judgment. At the hearing on Hartford's motion, the Court ordered further briefing on the applicability of ERISA to the policy in question. Additional briefs were submitted. After further oral argument and a bench trial on the ERISA issue, the Court (as will be explained) reluctantly concluded that the policy is an "employee welfare benefit plan" governed by ERISA. See 29 U.S.C. § 1002(1)(A). Given this ruling, the Court was then required to resolve two further questions: (1) whether Hartford's decision to deny benefits should be reviewed de novo or measured against a substantial evidence standard and (2) whether the decision passes muster under the appropriate review standard. For reasons explained here, the Court concluded that a substantial evidence standard is appropriate. But because the question is not free from doubt, the Court also reviewed the matter de novo. Recognizing that some uncertainty also attends the ERISA issue, the Court, in hearing the matter de novo, empaneled an advisory jury which concluded that the employee's death was not covered by the policy.[3]

---

1. Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

2. QuesTech's original Complaint alleged diversity jurisdiction. QuesTech is a Virginia corporation, and defendant Hartford is a Connecticut corporation that maintains business offices in Virginia, but has its principal place of business elsewhere. Following the Court's ruling that the policy was governed by ERISA, the plaintiff, with leave of Court, amended its complaint to allege federal question jurisdiction under ERISA. See 29 U.S.C. § 1132(a)(1)(B).

3. This procedure was selected in the interests of judicial economy. Whatever the outcome on appeal, a retrial is unlikely. If this Court's use of the substantial evidence standard is erroneous, then no retrial is necessary because this Court also heard the matter de novo, the results of which are reflected in this Memorandum Opinion. Also, if this Court erred in concluding that ERISA governed, then again no retrial would be necessary because the matter has already been heard and decided by a jury.

In this Memorandum Opinion, the Court sets forth its findings and conclusions concerning (1) the applicability of ERISA, (2) the appropriate ERISA review standard and (3) the policy coverage question. *See* Rule 52, Fed.R.Civ.P.

## Factual Background

### 1. The Policy

This story began in 1979 when QuesTech's Executive Committee, comprised of its five key officers, decided the company should purchase some form of accidental death insurance for its key officers.[4] As a defense contractor, QuesTech's officers often traveled to war risk areas in foreign countries. QuesTech initially sought a standard key-man indemnification policy to protect the company in the event that one or more officers died accidentally while traveling. In late 1980 or early 1981, Herbert Klotz, QuesTech's President and Chairman of the Board, informed QuesTech's insurance agent of the company's interest in obtaining such a policy. The policy was to be for the sole benefit of QuesTech. The agent advised QuesTech that a key-man term life insurance plan would be cost-prohibitive for the company, given the ages of the key officers. He also advised QuesTech that an accidental death policy expressly designed to benefit only the employer apparently could not be obtained. As a more economical alternative, the agent proposed that QuesTech obtain accidental death and dismemberment (ADD) benefits from Hartford in a standard employee benefit policy. QuesTech adopted this proposal and obtained a Hartford ADD policy covering its key officers. Although not sought by QuesTech, the dismemberment portion of the policy was nonetheless issued as an integral part of Hartford's standard ADD policy. Under the policy, QuesTech's key employees were covered during all travel, whether personal or business-related.[5] This first policy became effective May 15, 1981. QuesTech paid all policy premiums.

As issued, the policy provided for benefits to be paid to the key employees or to beneficiaries designated by the key employees. Sometime after issuance of the policy, QuesTech's insurance agent requested beneficiary cards from Hartford so that the key employees, pursuant to their understanding with the company, could designate QuesTech as the sole beneficiary of the policy benefits. In December 1981, more than six months after the policy issued, the agent received standard, pre-printed beneficiary designation cards from Hartford. Shortly thereafter, each key officer signed the cards, designating QuesTech as his beneficiary. The agent, QuesTech and the key employees apparently believed that the beneficiary designations were effective for all benefits to which the employees were entitled under the policy. In fact, the cards expressly designated QuesTech as the beneficiary only for accidental death benefits. The dismemberment benefits were not assigned; these benefits remained payable to each employee. Moreover, as the beneficiary cards made clear, the employees' beneficiary designations were revocable by the employees at any time.

In 1982, the agent learned that QuesTech also had a Hartford "war risk" policy for its full-time salaried employees. That policy provided accidental death and dismemberment benefits for these employees only during business-related travel. For administrative efficiency, the agent recommended that the key employee ADD policy be consolidated with the "war risk" policy under a master policy. QuesTech agreed, and on May 15, 1982, Hartford issued a "Master Policy" to the company. Classes I and II under the Master Policy consisted of QuesTech's key officers, who were afford-

---

4. At the relevant times, the Executive Committee conducted, managed and developed the company's business during the intervals between the meetings of the Board of Directors. QuesTech also had two wholly-owned subsidiaries, each of which had three key officers. The policy was to cover these officers as well.

5. There were several minor exclusions from this coverage, none of which is relevant to the dispute at bar.

ed coverage identical to that provided under the previous key employee ADD policy for pleasure and business travel.[6] Classes III and IV provided to all full-time salaried employees the "war risk" policy coverage of ADD and long-term disability benefits for injuries incurred only during business-related travel. The Master Policy was renewed in 1984, 1985, and 1986. From the initial purchase of the ADD policy in 1981 through 1986, QuesTech did not treat the key employee policy (Classes I and II) as an employee welfare benefit plan subject to ERISA. In contrast, QuesTech did treat the previous "war risk" policy, and its successor, Clauses III and IV of the Master Policy, as an ERISA plan.[7]

The event that set the stage for the dispute at bar occurred on November 12, 1986, when Herbert Klotz died in a single car accident on the Capital Beltway in the Washington, D.C. metropolitan area. According to the police report, Klotz's car left the road and crashed into a guardrail. He was wearing his seat belt and his body showed no visible signs of trauma. At the time of his death, Klotz was 69 years old and apparently in excellent health. The precise cause of his death was not determined; Klotz's body was cremated shortly after the accident and long before any dispute concerning the cause of death. No autopsy was ever performed; the state medical examiner's report listed the cause of death as cardiac arrest due to coronary arteriosclerosis.

At the time of his death, Klotz was insured under Class I of the Master Policy for $735,000. It is undisputed the policy was then in full force and effect. And Klotz, like the other key officers, had assigned to QuesTech his entitlement to death benefits. On January 6, 1987, QuesTech provided Hartford notice of its claim for the proceeds from the Master Policy owing to Klotz's death. Subsequently, QuesTech also provided Hartford the requisite proof of loss. Hartford denied QuesTech's claim, asserting that Klotz's death did not fall within the scope of the policy's coverage. Specifically, coverage was limited to "bodily injury resulting directly and independently of all other causes from accident which occurs: (a) while he or she is covered under; and (b) in the manner specified in; a Hazard applicable to his or her class." The policy explicitly excluded, in pertinent part, "[l]oss resulting from: (a) sickness or disease...." Klotz's proclaimed death from cardiac arrest as a consequence of coronary arteriosclerosis was a death resulting from disease and, therefore, did not result "directly and independently of all other causes from accident." Hartford's denial letter formally notified QuesTech that "[u]nder the E.R.I.S.A. Act should you wish to appeal this denial, please return the claim and written material supporting your contentions to our office within 60 days." QuesTech chose not to pursue this administrative appeal.

## Analysis

### 1. Applicability of ERISA

■ Before reaching the underlying benefits dispute, the threshold question is whether the benefits provided in Classes I and II of the Master Policy are governed by ERISA.[8] With some reluctance, the

6. More specifically, Class I covered Herbert Klotz, QuesTech's President and Chairman of the Board, for $735,000. Class II insured the remaining ten QuesTech officers for $500,000 each.

7. For Classes III and IV benefits, for example, QuesTech's Employee Benefits Administrator prepared the annual reports, summary annual reports, and summary plan descriptions required by ERISA and complied with all other ERISA reporting and disclosure requirements. See generally 29 U.S.C. §§ 1021–1029.

8. The Court assumes, without deciding, that the benefits provided in Classes I and II are severa-

ble from those provided in Classes III and IV for the purposes of determining ERISA applicability. QuesTech concedes that the benefits under Classes III and IV are governed by ERISA and, indeed, has treated these benefits as such since their issuance under the predecessor "war risk" policy. In contrast, the benefits under Classes I and II were not treated as ERISA benefits. QuesTech argues that the two class groups, in effect, constitute two separate policies with different coverage and benefit levels that happen to be lumped together in the "umbrella" of a Master Policy. Their affiliation, QuesTech argues, is in form only. Hartford disagrees, pointing out that a single "Master

Court concludes that they are—that the accidental death benefits relating to Klotz are part of an ERISA "employee welfare benefit plan." 29 U.S.C. § 1002(1). In reaching this conclusion, the Court need not venture beyond the plain language of the statute. Section 1002(1) defines an "employee welfare benefit plan" as

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care of benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1). In essence, there are three predicates for the establishment of an ERISA employee benefit plan: (1) the plan must have been established or maintained by an employer; (2) it must have been established or maintained for the purpose of "providing certain benefits to the participants or their beneficiaries;" and (3) the plan's benefits must be among those benefits listed. Here, there is no question that the policy meets the first criterion; it was established and is currently maintained by QuesTech, an employer. *See* 29 U.S.C. § 1002(5) (definition of employer). And QuesTech concedes, as it must, that the specific benefits provided under the policy—accidental death and dismemberment—fall clearly within the statutory enu-

meration of covered benefits; they are "benefits in the event of ... accident, disability, [or] death...." 29 U.S.C. § 1002(1).

QuesTech challenges only the second criterion, namely that the policy was established or maintained for the purpose of providing benefits to "participants or beneficiaries." QuesTech contends that this was not the policy's purpose. To be sure, QuesTech never intended that the employees receive any benefits; the policy was obtained for the sole benefit of QuesTech. Given this intention, QuesTech argues that the key employees were never true "participants" in the policy. Though not without some force, this argument is ultimately unpersuasive. Instead, it is the form of the policy coupled with the statutory definitions of "participant" and "beneficiary" that carry the day. Under ERISA, a "participant" is

any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, *or whose beneficiaries may be eligible to receive any such benefit.*

29 U.S.C. § 1002(7) (emphasis added). Klotz and the Class II employees plainly qualify as ERISA plan "participants" (1) because they are employees eligible to receive a benefit, *i.e.,* death and dismemberment benefits from May to December 1981 and dismemberment benefits thereafter, and (2) because they are employees "whose beneficiar[y]" was eligible to receive a plan benefit, *i.e.,* death benefits from December 1981 forward. It is not significant that Klotz was not himself entitled to the death benefits. An employee's individual entitlement to benefits is not a statutory prereq-

Policy," like the one at bar, with multiple classes and benefit levels is not uncommon in the insurance industry and remains a single policy for ERISA purposes. While the Court does not decide whether Classes I and II can be severed from Classes III and IV for purposes of applying ERISA, it does decide, as explained *infra,* that the Classes I and II accidental death benefits

cannot be severed from the dismemberment benefits for those Classes. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 107–08, 103 S.Ct. 2890, 2905–06, 77 L.Ed.2d 490 (1983). This decision makes it unnecessary to reach the question of severing Classes I and II from Classes III and IV.

uisite for qualification as an ERISA plan "participant." Nor does it appear relevant that Klotz and the Class II employees designated QuesTech as the beneficiary of the death benefits. ERISA defines a "beneficiary" as "a person designated by a participant ... who is or may become entitled to a benefit [under the plan]." 29 U.S.C. § 1002(8). And "person" under the statute includes corporations. 29 U.S.C. § 1002(9). In short, nothing in the statute precludes an employee's designation of the employer as beneficiary.[9]

In any event, whether or not by design, Klotz and the Class II employees undeniably remained at all times entitled to receive the dismemberment benefits. Thus, even if the ERISA definition of "beneficiary" were construed to exclude employers, the conclusion that the policy was an ERISA employee benefit plan would still hold unless this Court severed the death benefits from the dismemberment benefits. Significantly, the Supreme Court has cautioned against such attempts to carve up a plan, pointing to the "administrative impracticability of permitting mutually exclusive pockets of federal and state jurisdiction within a plan." *Shaw v. Delta Air Lines*, 463 U.S. 85, 107–08, 103 S.Ct. 2890, 2905–06, 77 L.Ed.2d 490 (1983). It is also worth noting that Klotz and the Class II employees always retained the right under the policy to revoke this beneficiary designation at any time and to make a new one. In summary, the form of the policy coupled with the statutory definitions point persuasively to the conclusion that the Class I and Class II aspects of the policy, as well as those of Classes III and IV, are "employee benefit plans" governed by ERISA.

Although QuesTech's argument is ultimately unpersuasive, the Court is not blind to its appeal as a matter of ERISA's goal. ERISA was enacted to protect the interests of *employees* and their beneficiaries, presumably family members, in employee benefit plans. *See* 29 U.S.C. § 1001(b); *Firestone Tire & Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44, 107 S.Ct. 1549, 1551, 95 L.Ed.2d 39 (1987); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983); *Powell v. Chesapeake & Potomac Telephone Co. of Va.*, 780 F.2d 419, 421 (4th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986); *see also Massachusetts v. Morash*, —— U.S. ——, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) ("In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds."). ERISA, it seems, is not concerned with *employer* benefit plans. Given this, QuesTech invites the Court to ignore the form of the policy and focus instead on the parties' intentions to determine the policy's true purpose. The Court declines this invitation. The statute, to be sure, refers to "purpose."[10] But neither this reference, nor any other portion of ERISA, directs courts to ignore the terms of a policy and to engage instead in a broad inquiry into the intent of the parties. Nor would it seem prudent to do so. While such an inquiry in the case at bar may appear simple and straightforward, it takes little imagination to see that this may not be so in other instances. For example, the parties may disagree as to the policy's purpose or it might be argued that while the immediate purpose of the policy is to benefit the company, the overriding and long-term purpose of paying key employee death benefits to the company is to benefit the employees. Courts should avoid this

---

**9.** Had this policy been a group life insurance policy, Virginia law apparently would have prohibited Klotz's designation of QuesTech as the beneficiary. *See* Va.Code Ann. § 38.2–3320(A)(4) (1986) ("A group life insurance policy shall be for the benefit of persons other than the employer or labor union.") No similar statutory provision, however, extends this restriction to accident and sickness insurance policies, such as the one in dispute. *Compare* Va.Code Ann. § 38.2–109 (definition of "accident and sickness insurance") *with* Va.Code Ann. § 38.2–102 (definition of "life insurance").

**10.** An ERISA plan is one established and maintained "for the purpose of providing for its participants or their beneficiaries" certain benefits. 29 U.S.C. § 1002(1).

quagmire in the absence of clear legislative direction to the contrary. In the case at bar, the policy for Klotz and Class II employees fits squarely within the definition of an ERISA employee welfare benefit plan.[11] That QuesTech may have intended otherwise is immaterial.[12]

Given that the Class I and Class II aspects of the policy, like those of Classes III and IV, constitute an ERISA employee benefit plan, it follows that QuesTech, as an ERISA plan beneficiary, is entitled to sue Hartford, a plan fiduciary,[13] "to recover benefits ... under the terms of [the] plan...." 29 U.S.C. § 1132(a)(1)(B).[14]

### 2. *Standard of Review*

■ ERISA is silent on the appropriate standard of review. Even so, until recently the answer in this and most other circuits was clear: benefit determinations were reviewed only to determine whether they were arbitrary or capricious. *See Voliva v. Seafarers Pension Plan,* 858 F.2d 195, 196 (4th Cir.1988) [citing *Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1007 (4th Cir.1985) ]; *LeFebre v. Westinghouse Elec. Corp.,* 747

F.2d 197, 204 (4th Cir.1984).[15] The Supreme Court's recent decision in *Firestone Tire and Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), rejected the uniform application of this deferential standard to all ERISA benefit determinations in § 1132(a)(1)(B) actions. *See id.* 109 S.Ct. at 953. Only where an ERISA administrator or fiduciary is expressly given "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," is the arbitrary and capricious standard appropriate in § 1132(a)(1)(B) actions. *Id.* at 956.[16] Absent such express authority, a denial of ERISA benefits based on an interpretation of the plan or its terms must be reviewed *de novo. Id.* In either case, the review must be limited to the record before the administrator or fiduciary at the time the benefits decision was made. *Voliva,* 858 F.2d at 196 [citing *Berry v. Ciba–Geigy Corp.,* 761 F.2d at 1007].

Given the nature of Hartford's decision in this case, the Court concludes that an arbitrary and capricious standard is appro-

---

**11.** Note that the Court does not decide whether the same result would obtain had Klotz and the Class II employees *irrevocably* designated QuesTech as the beneficiary of *all* benefits, including those payable for dismemberment.

**12.** Also immaterial is the parties' failure to treat the Class I and Class II aspects of the policy as an ERISA plan. The parties' beliefs in this regard do not affect ERISA's applicability. *See Firestone,* 109 S.Ct. at 951 (ERISA applied to a company's termination pay plan even though the company "was not aware that the ... plan was governed by ERISA, and therefore had not set up a claims procedure, 29 U.S.C. § 1133, nor complied with ERISA's reporting and disclosure obligations, 29 U.S.C. §§ 1021–1031, with respect to that plan").

**13.** Hartford is considered an ERISA fiduciary to the extent it "has any discretionary authority or discretionary responsibility in the administration" of an ERISA plan. 29 U.S.C. § 1002(21)(A)(iii). Hartford's role as a fiduciary in this case was not contested.

**14.** It is undisputed that Hartford provided QuesTech with written notice of the reasons for the denial of benefits and an opportunity for "a full and fair review" of the denial decision. *See* 29 U.S.C. § 1133. QuesTech did not seek such review. Although ERISA does not explicitly require exhaustion, courts in this Circuit require

that administrative avenues for review be pursued before resorting to any judicial remedy. *See Makar v. Health Care Corp.,* 872 F.2d 80, 82 (4th Cir.1989); *Taylor v. Bakery & Confectionery Union & Indus. Int'l Welfare Fund,* 455 F.Supp. 816, 819 (E.D.N.C.1978); *see also Kross v. Western Elec. Co.,* 701 F.2d 1238 (7th Cir.1983). Here, however, the Court is persuaded that such review would have been futile, given the voluminous documentation already submitted by QuesTech in support of its demand for benefits and the lengthy and exhaustive review of those materials already undertaken by Hartford. *See Makar,* at 83 (clear finding of futility may abrogate exhaustion requirement) [citing *Fizer v. Safeway Stores, Inc.,* 586 F.2d 182, 183 (10th Cir.1978) ].

**15.** *See also Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 333 (3d Cir.1984); *Bayles v. Central States, Southeast & Southwest Areas Pension Fund,* 602 F.2d 97, 99–100 and n. 3 (5th Cir.1979).

**16.** *See, e.g., Boyd v. Trustees of the United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59, (4th Cir. April 21, 1989) (abuse of discretion applied where pension fund trustees had explicit discretionary authority to determine eligibility for benefits and to promulgate regulations to implement the pension plan).

priate. It is clear that nothing in the policy at bar expressly authorizes Hartford to exercise discretion in determining eligibility for benefits or in interpreting the policy's terms. Eligibility criteria and key terms are explicitly defined in the policy documents. Hartford, however, was not called upon to exercise such discretion. Here, it was undisputed that Mr. Klotz was expressly covered under the terms of the policy, that the policy was in full force and effect at the time of his death, that he died, and that QuesTech was his designated beneficiary for accidental death benefits. The only question remaining was whether his death resulted "directly and independently of all other causes from accident." Hartford's answer, based on a review of the evidence presented by QuesTech and the fruits of its own independent investigation, was, "no"; it concluded that Klotz's death was caused, at least in part, by non-accidental physical conditions. That answer was simply a factual determination based on the evidence presented. Given this, the Court ruled that substantial evidence/arbitrary and capricious was the appropriate standard of review.

The rationale for this conclusion is that it seems unlikely that Congress intended federal courts to review *de novo* every factual determination inherent in coverage decisions. And *Firestone*, carefully read, does not require this. In *Firestone*, the court's holding focused only on a plan interpretation by an ERISA plan fiduciary. When a plan fiduciary construes plan terms without the explicit authority to do so, more careful scrutiny of the fiduciary's interpretation, as *Firestone* requires, is justified. There is no concomitant need for this more exacting scrutiny where, as here, the question decided by the plan fiduciary was a factual one, not one of plan construction. In any event, because this issue has not been authoritatively resolved,[17] the Court reviewed the matter *de novo*. An advisory jury also heard the evidence in the case as if the case were a diversity insurance policy dispute. In all three instances, the result was the same: the Court's substantial evidence review, its *de novo* review and the jury's verdict all confirmed that Hartford correctly concluded that Klotz's death was not caused by an accident "directly and independently of all other causes."

### 3. Review of Hartford's Denial of Benefits

Ample record evidence supports Hartford's decision to deny QuesTech's claim for benefits.[18] Indeed, there was virtual unanimity among the various official records on the cause of Klotz's death. First, the physician who treated Klotz in the emergency room on November 12, 1986 concluded that he died from cardiac arrest. That diagnosis was confirmed by the state medical examiner's report and Certificate of Death, both of which described the cause of death as "Cardiac Arrest due to or

17. The Fourth Circuit's recent decision in *Dzinglski v. Weirton Steel Corp.*; 875 F.2d 1075 (1989), issued after the trial at bar, may cast some doubt on the Court's conclusion. There, the court reviewed a trustee's decision to deny benefits *de novo* because the trustee, like Hartford in this case, was not explicitly granted any discretionary authority to grant or deny benefits. *See id.,* at 1079. Rather, the trustee, like Hartford, was authorized only to determine whether the employee satisfied the pre-determined eligibility standards of a retirement plan. *Id.* In *Dzinglski,* however, the nature of that determination was substantially different from that facing Hartford. There, the only dispute was whether the employee's retirement was considered by his employer to be in the employer's interest, a pre-condition of retirement benefits. *Id.* The trustee was not in a position to doubt the employer's determination that the retirement was not in its interest and based on that

determination, denied benefits. *Id.* Here, in contrast, Hartford did not rely solely on QuesTech's representations or the reports of the hospital, the state medical examiner, and the state police, regarding the nature of Klotz's cause of death. Rather, it hired an outside company to conduct an independent investigation of the accident. In this case, it would be odd indeed if QuesTech, Klotz's sole designated beneficiary, were permitted to determine Klotz's eligibility for benefits. In that event, heightened scrutiny might well be appropriate. Absent such an apparent conflict of interest, the Court is not persuaded that *de novo* review is mandated under *Firestone* or *Dzinglski.*

18. The record before Hartford at the time of its decision was submitted at trial both through voluminous documentary evidence and live testimony.

as a consequence of coronary arteriosclerosis." The Maryland State Police report likewise concluded that Klotz suffered a fatal heart attack while driving. That determination was based on its investigation of the accident scene, an eyewitness description of the accident,[19] the diagnoses of the emergency room physician and state medical examiner, and the absence of any visible injuries to Klotz. An inspection of Klotz's automobile revealed no major defects in the engine, steering or braking systems. Hartford also ordered a complete, independent investigation of the accident, the results of which corroborated these findings.

Two significant pieces of evidence were presented to Hartford by QuesTech to contradict this otherwise unanimous conclusion. The first was a letter from Klotz's personal physician, stating that Klotz had no history or symptomatology of coronary arteriosclerosis. The absence of such symptomatology, however, certainly does not preclude the presence of the disease. The second was a letter from the emergency room physician, calling into question his diagnosis of cardiac arrest and the state medical examiner's conclusion of cardiac arrest due to coronary arteriosclerosis. The physician had based his original diagnosis, in substantial part, on erroneous information that an eyewitness had seen Klotz slumped over his steering wheel before impact. This information was also relayed to the state medical examiner. Upon learning that this information was false, the physician questioned the validity of his and the state medical examiner's

diagnoses. He did not, however, suggest an alternative diagnosis or explicitly reject the possibility that cardiac arrest was the cause of Klotz's death. These two letters —stacked against the official records and reports of the hospital, medical examiner, and police—did not convince Hartford that Klotz's death was solely the result of an accident. Hartford's determination that QuesTech was not entitled to benefits under the policy, though controverted, was nonetheless supported by substantial record evidence.

A review of the record de novo yields the same conclusion. QuesTech failed to meet its burden of proving by a preponderance of the evidence that Klotz died solely as a result of accidental means.[20] At best, the evidence is in equipoise. There is no conclusive evidence that Klotz died of cardiac arrest, independent of the automobile accident. But QuesTech similarly cannot establish with the requisite proof the converse, that Klotz died solely from the accident. QuesTech has not explained, for example, why Klotz's car veered suddenly, but apparently without braking, across a busy highway at more than 50 miles per hour to the right shoulder and down an embankment before crashing into a guardrail. No witness clearly observed Klotz's behavior or manner before the impact. Post-accident inspections revealed no mechanical failure in the car. The physical evidence at the accident scene showed, significantly, that Klotz had not attempted to apply the brakes as his vehicle crossed several lanes of traffic, left the highway and careened some distance down an embankment before striking a concrete abut-

19. The single eyewitness to the accident testified only that he saw Klotz's car veer quickly, but smoothly, from the middle lane of the highway to the right lane, then onto the right shoulder for about 100 feet, down an embankment and into a guardrail. He did not observe any brake lights, suggesting that Klotz never applied the brakes. He apparently did not clearly observe Klotz before impact, but did see him inside the car immediately after the crash. There were no visible injuries or blood, the witness reported, but Klotz was glassy-eyed and moved his head very slowly. Klotz did not respond to the witness's attempts to gain entry in Klotz's locked car.

20. Under ERISA, QuesTech bears the burden of demonstrating that Hartford's denial of benefits was arbitrary and capricious. See Maggard v. O'Connell, 703 F.2d 1284 (D.C.Cir.1983); Carr v. Trustees of Hotel & Restaurant Employees and Bartenders Int'l Union Pension Fund, 585 F.Supp. 949 (D.C.Pa.1984). It follows that QuesTech would also bear the burden of proof in a de novo review of the record under Firestone. Of course, QuesTech would bear a similar burden in a non-ERISA, diversity insurance contract case. See Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943); Virginia Transit Co. v. Schain, 205 Va. 373, 137 S.E.2d 22 (1964); Nosay v. Owens, 193 Va. 343, 68 S.E.2d 531 (1952).

ment. This and the absence of any external signs of body trauma support the conclusion that Klotz suffered some disabling affliction prior to the collision with the abutment. Given Klotz's age and the unusual circumstances of the accident, therefore, the probability of cardiac arrest or even a comparable disabling physical condition, *e.g.*, a stroke or other blackout, is fairly good.

Significantly, QuesTech failed to establish any more probable alternative theory. At trial, QuesTech speculated that Klotz may have suffered an incapacitating kidney stone attack that led to the accident which ultimately caused his death. It is doubtful that such a scenario would constitute death solely as a result of an accident as defined in the policy. In any event, QuesTech offered insufficient evidence to support this or any other alternate theory. Thus, on the record, QuesTech failed to meet its burden.

The Court, along with the advisory jury, also heard evidence beyond the scope of the administrative record. This extra-record evidence consisted primarily of testimony from three expert witnesses and additional testimony from the Deputy Medical Examiner who signed Klotz's death certificate.[21] Nothing presented at trial persuaded the Court or jury that QuesTech had carried its burden. The accident reconstruction expert hired by QuesTech simply estimated the force of impact on Klotz's car at the time of the crash. Predicated on this estimate, a forensic pathologist—who had not examined Klotz or visited the accident site, and had not spoken with Klotz's physicians, the Deputy Medical Examiner, the state troopers, paramedics or any member of Klotz's family—opined that Klotz died as a result of blunt force trauma sustained in the crash. The Court, and apparently the jury, found this opinion entirely unconvincing. This expert proffered no opinion on why Klotz's car suddenly left the roadway or why Klotz had made no attempt to apply his brakes. Nor did he express an opinion on whether a fatal injury may have occurred before impact. The third expert, a

cardiologist, simply testified that sudden cardiac arrest, even without prior symptomatology of heart disease, is very common in males in Klotz's age group. His testimony supported the record diagnoses of death from cardiac arrest due to arteriosclerosis.

The final significant item of extra-record evidence was provided by the testimony of the Deputy Medical Examiner who filed Klotz's death certificate. At trial, he explained the bases for his conclusion that Klotz died of natural causes, namely cardiac arrest as a consequence of coronary arteriosclerosis. Specifically, he relied on information he received from the state police and emergency room physicians concerning the circumstances surrounding the accident. He was also told that Klotz had a long history of heart disease, that he was slumped over the wheel while driving, that Klotz's car was swerving from side to side, and that other drivers on the highway had not observed any brake lights. His own observations during a brief examination of Klotz revealed an elderly white male with no external evidence of trauma. Given this information, he concluded that Klotz died of a cardiac arrest due to coronary arteriosclerosis. The fact that this diagnosis was based, in part, on erroneous information may cast some doubt on its validity. But it does nothing to strengthen QuesTech's contention that Klotz's death was solely the result of injuries sustained in the automobile crash. Put another way, casting doubt on one theory does not, by itself, enable a party to carry its burden of proving another theory. Thus, even if QuesTech had conclusively proved, as it did not, that Klotz did not die of cardiac arrest, it never proved that he died solely of accidental means. Thus, QuesTech has failed to meet its admittedly difficult burden under the policy terms. Accordingly, Hartford's denial of benefits was proper.

An appropriate Order has been entered.

---

**21.** Several additional minor witnesses also testified. For example, Mr. Klotz's former secretary testified briefly concerning her observation of his work habits. Three law enforcement officers described the scene of the crash, but none observed Mr. Klotz.