**Pamela PIROZZI, Plaintiff,**

v.

**BLUE CROSS–BLUE SHIELD OF VIRGINIA, Defendant.**

Civ. A. No. 90–461–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 9, 1990.

---

Douglas M. Coleman, Cunningham & Hudgins, Alexandria, Va., for plaintiff.

Thomas E. Spahn, McGuire, Woods, Battle & Boothe, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This case presents a coverage question under a group health plan. As such, it is hardly novel. But the novelty here is the factual context. Plaintiff seeks a declaratory judgment that her group health plan, administered by defendant Blue Cross-Blue Shield of Virginia ("Blue Cross"), covers high dose chemotherapy with autologous bone marrow transplant ("HDCT-ABMT") for treatment of her Stage IV metastatic breast cancer. The question whether the plan covers HDCT-ABMT for treatment of plaintiff's condition is apparently one of first impression in this circuit and elsewhere.

### Proceedings to Date

This cause first came before the Court on April 3, 1990 when plaintiff requested an expedited trial on her Complaint and Application for Declaratory Judgment.[1] In support of this request, plaintiff pointed out that her condition was one well-documented to progress rapidly and that only an expedited resolution of this dispute would be effective. Left on this Division's normal five to six month trial docket, the dispute likely would be overtaken by events and rendered irrelevant. Given this, the Court promptly granted plaintiff's request and set the trial for April 17, 1990. The parties waived a jury.

As scheduled, the trial commenced on April 17, 1990 and lasted two days. Plaintiff presented testimony from four witnesses, including two experts, and introduced documentary evidence. Plaintiff's experts were Roy A. Beveridge, M.D. and Stanley P. Watkins, Jr., M.D., the latter being plaintiff's treating oncologist and the former, an expert oncologist. Plaintiff and John Lawrence Colley, M.D., Medical Director of Blue Cross testified as fact witnesses. Defendant's sole fact and expert witness was Dr. Colley.

At the conclusion of the trial, the Court stated its findings and conclusions from the bench, holding that plaintiff had met her burden of proving that HDCT-ABMT treatment falls within the health plan's coverage. The Court issued a declaratory judgment to that effect and indicated that written findings of fact and conclusions of law would be forthcoming to amplify those delivered from the bench. These findings of fact and conclusions of law, issued pursuant to Rule 52(a), Fed.R.Civ.P., fulfill this promise.

### Facts

Plaintiff, a Maryland resident, is a beneficiary of a health insurance policy administered and provided by Blue Cross (the "Plan")[2]. Defendant Blue Cross is a not-for-profit health service corporation incorporated in Virginia, with its principal place of business in Richmond, Virginia. It contracts with individuals and groups to pay for certain health services.

Plaintiff, a 35-year old pre-menopausal woman with three children, suffers from

---

**1.** As this is an ERISA dispute, federal jurisdiction exists pursuant to 29 U.S.C. § 1101 *et seq.* An alternative basis for jurisdiction exists pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy exceeds $50,000, exclusive of interest and costs.

Venue in the Eastern District of Virginia is proper under 28 U.S.C. § 1391(b).

**2.** Plaintiff, through her husband's employer, is insured under a Blue Cross policy of group health insurance issued and delivered in Virginia and administered pursuant to the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 *et seq.*

Stage IV metastatic breast cancer[3]. After discovering a mass in her breast, she underwent a mastectomy that revealed cancer in one lymph node. In an attempt to cure the cancer, plaintiff underwent six cycles of chemotherapy from June through December 1989. Despite these efforts, plaintiff experienced a recurrence of cancer in her right rib cage, which was documented by her physician, Dr. Stanley P. Watkins, Jr., on January 31, 1990. Dr. Watkins then prescribed radiation therapy. In spite of the radiation treatment, by March 1990 Dr. Watkins noted further spreading of the cancer throughout plaintiff's rib cage. As a result, Dr. Watkins prescribed high dose chemotherapy with autologous bone marrow transplant ("HDCT–ABMT") as plaintiff's "best chance for any type of meaningful survival."

HDCT–ABMT is a procedure by which bone marrow is extracted from the patient's body, frozen, and stored while the patient receives large, near lethal doses of chemotherapy. In some cases the chemotherapy is administered in doses in excess of one thousand times the standard dose. This high dose chemotherapy kills not only the cancer, but much of the patient's remaining bone marrow as well. This secondary effect, untreated, could well be lethal to the patient. Thus, after the chemotherapy is completed, the patient's stored bone marrow is returned to the patient's body to replace the damaged bone marrow and thereby "rescue" the patient. A patient undergoing HDCT–ABMT is hospitalized, often in intensive care, for approximately 10 days of the treatment and requires full-time medical attention. For insurance purposes, the elements of the procedure include a hospital stay, chemotherapy, bone marrow transplant, and follow-up medical care. The entire procedure costs approximately $100,000. Most health care facilities that provide the treatment require pre-payment, or a substantial deposit.

As a result of Dr. Watkins' recommendation that plaintiff undergo HDCT–ABMT treatment, plaintiff sought the treatment at Montefiore Hospital in Pittsburgh, Pennsylvania. Dr. Stanley Jacobs of Montefiore Hospital solicited Blue–Cross' pre-authorization for plaintiff's HDCT–ABMT procedure pursuant to the Plan's terms. Blue Cross, by Dr. Colley, denied this pre-authorization on March 20, 1990 solely on the basis of the Plan's exclusion of coverage for "experimental or clinical investigative procedures.[4]" Dr. Colley testified that he had previously determined that HDCT–ABMT was an experimental procedure excluded from coverage under the Plan and thus he denied plaintiff's pre-authorization claim as a matter of course. This coverage denial is the crux of the parties' dispute. Simply put, plaintiff contends that coverage exists because HDCT–ABMT is not an "experimental or clinical investigative" procedure, but is, instead, the medically indicated, state of the art, generally accepted treatment for her disease. Blue Cross disagrees, arguing that the procedure is still experimental and has not conclusively been proven to increase patients' survival rates. The insurance contract nowhere defines an "experimental or clinical investigative" procedure. Thus, the parties' dispute is one of contract interpretation, namely whether HDCT–ABMT is excluded from the Plan's coverage by virtue of the so-called "experimental treatment exclusion" which, stated in full, excludes

> [e]xperimental or clinical investigative procedures; services of no scientifically proven medical value; also services not in accordance with generally accepted standards of medical practice.

Before engaging in an analysis of this provision and an assessment of the factual record, it is important to set out the governing legal principles.

---

3. Cancer is typically classified in terms of five stages of increasing severity from Stage I to Stage V. "Stage IV," in connection with breast cancer, signifies that the cancer cells have metastasized, *i.e.,* spread, to areas outside of the breast, the original site of the disease. *See The* *Merck Manual of Diagnosis & Therapy* 2076 (14th ed. 1982).

4. Blue Cross concedes that the Plan covers standard dose chemotherapy without the ABMT. Plaintiff's earlier chemotherapy was covered.

## Standard of Review

As stipulated by the parties, plaintiff's Blue Cross insurance policy is part of an ERISA "employee welfare benefit plan." 29 U.S.C. § 1002(1). As such, its administration is governed by the provisions of ERISA, 29 U.S.C. § 1101 *et seq.*, and plaintiff is a "beneficiary" entitled to sue a plan fiduciary "to recover benefits ... under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B). Central to the resolution of this case is the appropriate ERISA standard of judicial review that controls analysis of the decision to deny coverage for plaintiff's HDCT–ABMT. There are two standards of review applicable to ERISA § 1132 actions challenging benefits determinations by a plan administrator: (1) *de novo* and (2) arbitrary and capricious. "[C]ourts should use a *de novo* standard of review in ERISA cases brought for review of a benefits determination, *unless* the plan involved vests discretion in the plan trustee to interpret its doubtful or ambiguous provisions." *Dewitt v. State Farm Ins. Co. Retirement Plan for United States Employees,* 905 F.2d 798 (4th Cir.1990) (emphasis in original); *see also Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Questech, Inc. v. Hartford Acc. & Indem. Co.,* 713 F.Supp. 956, 962 (E.D.Va.1989). Thus, the arbitrary and capricious standard is appropriate only where an ERISA administrator or fiduciary is expressly given "discretionary authority to determine eligibility for benefits or to construe the terms of the plan". *Bruch,* 109 S.Ct. at 956; *see also, de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1186 (4th Cir.1989) (same); *Questech,* 713

F.Supp. at 962 (same). These principles, applied to the facts of this case, lead to the conclusion that a *de novo* standard of review is required here.

■ Analysis properly begins with the Plan's terms. In only one respect does the Plan confer discretion on Dr. Colley, the Plan's administrator and fiduciary. Only decisions whether a procedure is "Medically Necessary" are explicitly committed to the administrator's discretion.[5] Significantly, however, medical necessity was not the basis for Dr. Colley's denial of coverage for plaintiff's HDCT–ABMT treatment. Instead, he relied solely on the experimental procedure exclusion, as to which the Plan confers no discretion on the administrator. From this, it follows that Dr. Colley's decision must be reviewed *de novo.*[6] With this review standard as its lens, the Court now focuses on the meaning of the experimental treatment exclusion as it applies to HDCT–ABMT for plaintiff.

## Plan Interpretation

■ The starting point in the interpretive task is the principle that the Plan's terms must be given their "plain meaning." *See Johnson v. District 2 Marine Eng'rs Beneficial Ass'n—Asso. Maritime Officers Medical Plan,* 857 F.2d 514, 516 (9th Cir. 1988) (citations omitted). If their meaning is clear, the analysis is over. But where, as here, an ambiguity exists, further analysis is required. As the Ninth Circuit noted in construing a similar health plan provision, "[i]n the context of modern medicine, the term experimental seems clearly ambiguous on its face." *Id.* Nowhere does the Plan define "experimental" or "clinical

---

5. Two related provisions confer this discretion on Dr. Colley. The Plan's payment rules state that,

> [B]enefits will be denied if the Plan determines, in its sole discretion, that care is not Medically Necessary.

Art. II, A.4. *See also* Art. V, A.36 (excluding "[a]ny service determined to be not Medically Necessary by the plan, in its sole discretion").

6. This conclusion finds support in the comparison of the Plan at bar with the State Farm plan found by the Fourth Circuit in *DeWitt* to require only arbitrary and capricious review. The State Farm plan confers discretion on that adminis-

trator in broad, sweeping language that is in sharp contrast to the limited administrative discretion conferred by the Plan at bar. Thus, the State Farm plan provided as follows:

> The plan administrator shall have the power ... *to make all determinations that the plan requires for its administration, and to construe and interpret the plan whenever necessary* to carry out its intent and purpose and to facilitate its administration. *All such rules, regulations, determinations, constructions and interpretations made by the plan administrator shall be binding....*

*Dewitt,* 905 F.2d at 801 (emphasis added).

investigative," nor does it explain what quantum or type of evidence is required to demonstrate that a treatment is not experimental. More specifically, nothing in the Plan requires that a treatment be successfully evaluated using a particular type of test, or that a treatment demonstrate a particular threshold of statistical success in terms of a cure or survival rate. Given this, the Court must resolve the ambiguity by reference to the Plan's structure and to the testimony of experts, as the Seventh Circuit sensibly did in *Reilly v. Blue Cross & Blue Shield of Wisconsin,* 846 F.2d 416, 420–24 (7th Cir.1988), *cert. denied* 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988).

To a large extent, the focus at trial was on whether the HDCT–ABMT treatment is "experimental" under the Plan. But the Plan's experimental treatment exclusion consists of more than the exclusion for "experimental or clinical investigative" treatments. In fact, the exclusion is in three parts. Also excluded are treatments "of no scientifically proven value" and those "not in accordance with generally accepted standards of medical practice." This three-part structure is illuminating. Each part helps shed light on the others and it appears that they are intended to function cooperatively. For example, a treatment found to be "in accordance with generally accepted standards of medical practice" would hardly be "experimental." Similarly, a procedure found to be of "scientifically proven value" would not likely be "experimental." The three-parts of the exclusion are thus linked. In this context, therefore, if HDCT–ABMT is in accordance with generally accepted standards of medical practice and is of scientifically proven value, it is surely not also experimental or clinically investigative.[7] With this in mind,

the Court now turns to examine the expert testimony adduced at trial.

Dr. Colley, licensed by the National Board of Medical Examiners and the American Board of Quality Assurance and Utilization Review Physicians, testified not as an expert in oncology, but as a Blue Cross expert with respect to (i) Plan coverage; (ii) new technology, procedure and drug evaluation; and (iii) technology assessment. Dr. Colley testified that he denied coverage in reliance on the Blue Cross–Blue Shield Association's[8] December 1988 Uniform Medical Policy Memorandum concluding that HDCT–ABMT is experimental. While acknowledging that the Memorandum was prepared in 1988, he stated that he has seen no evidence in the interim to persuade him to alter his position. In sum, as he put it, he merely "applied the policy" and rejected plaintiff's pre-authorization for HDCT–ABMT, solely on the ground that the Association deemed the procedure experimental.

Dr. Colley explained that the basis of the Association's conclusion regarding HDCT–ABMT was the application of certain "technology evaluation criteria." The criteria, developed by the Association, consist of five inquiries:

(1) Is the drug or device approved by the Food & Drug Administration ("FDA") to market for the particular indication or application in question?

(2) Is there sufficient information in the peer-reviewed medical and scientific literature to enable Blue Cross to make conclusions about the drug's, device's, or procedure's safety and efficacy?

(3) Does the available scientific evidence demonstrate a net beneficial effect on health outcomes?

---

7. This conclusion is consistent with the dictionary definition of "experimental" as that which "[i]s of ... or relating to an experiment." *Webster's II New Riverside University Dictionary* 454 (1984). And, "experiment," in turn, means "a test performed ... to ascertain the efficacy of something previously untried." *Id.* The efficacy of HDCT–ABMT cannot be said to be previously untried if it is in accordance with generally accepted standards of medical practice and of proven scientific value.

8. The Blue Cross–Blue Shield Association (the "Association") is a corporation separate from Blue Cross–Blue Shield of Virginia. It has an independent technology evaluation process by which it develops policy recommendations for member plans. Member plans are free to follow the Association's recommendations or to develop their own policies. Blue Cross follows the Association's recommendation and thus classifies HDCT–ABMT as experimental.

(4) Is the drug, device or procedure as safe and efficacious as existing diagnostic or therapeutic alternatives?

(5) Can the drug, device or procedure reasonably be expected to satisfy criteria 3 and 4 when applied outside the research setting?

According to Dr. Colley, a drug, device or treatment that fails to meet *any one* of the five criteria is excluded from coverage by virtue of the experimental procedure exclusion. In his view, HDCT–ABMT treatment is excluded because it fails to meet *all* five criteria. This testimony is unpersuasive for several reasons. First, the criteria are not part of the Plan and the Plan nowhere states that the Blue Cross criteria are determinative of a treatment's experimental status. The mere fact that Dr. Colley felt constrained to use those criteria as his guide is not sufficient reason to read them into the Plan. Beyond this, several criteria are question begging, for they do not define "sufficient information," "a net beneficial effect on health outcomes," or "safe and efficacious." In this respect, Dr. Colley, merely gave his opinion on a topic outside his area of expertise.

In reaching his conclusion that HDCT–ABMT is experimental, Dr. Colley claimed support in the published, peer-reviewed literature. As he reads this literature, it is inconclusive with respect to the efficacy of HDCT–ABMT. Existing data, in his view, does not demonstrate an increased survival rate in patients who receive HDCT–ABMT. Dr. Colley further testified that while HDCT–ABMT has been tested on a number of patients, that number is still too small to provide enough data for confident evaluation of the treatment's effect. Yet, he was unable to suggest a number of patients that would provide sufficient data. Dr. Colley placed special emphasis on the fact that HDCT–ABMT had not been tested adequately by so-called Phase III double-blind studies utilizing a placebo, or control, group.

Against Dr. Colley's testimony must be weighed the directly contrary testimony of two Board-certified oncologists, Dr. Roy Beveridge, M.D., and Dr. Stanley Watkins, M.D.. Dr. Beveridge, the head of bone-marrow transplants at Fairfax County Hospital in Fairfax, Virginia, emphatically and persuasively contradicted Dr. Colley's conclusion that HDCT–ABMT treatment is experimental. Dr. Beveridge testified in general terms about the treatment, stating that it was the medically necessary and effective treatment for plaintiff given her condition. He noted that far from being unusual, HDCT–ABMT treatment is currently in use at most major medical centers, including, *inter alia*, Duke University, Fairfax County Hospital, George Washington University, Georgetown University, Harvard University, Johns Hopkins University, Medical College of Virginia, Houston's M.D. Anderson Hospital, University of Chicago, University of Michigan, University of Nebraska, University of Texas—San Antonio, University of Virginia Medical Center, University of Wisconsin, Yale University Medical School, and all Florida teaching hospitals. This is convincing evidence that the treatment has "scientifically proven value" and is "in accordance with generally accepted standards of medical practice."

Dr. Beveridge also addressed each of Blue Cross' "technology evaluation criteria," refuting Dr. Colley's determination that the criteria, even if applicable, classify the procedure as experimental or investigative in nature. With respect to the first criterion, Dr. Beveridge testified that the drugs routinely used in HDCT–ABMT, cytoxan and thiotepa, are FDA approved and have been used for breast cancer treatment for the past fifteen years.[9] In support of HDCT–ABMT's satisfaction of the second criterion, Dr. Beveridge stated that ample published evidence demonstrates HDCT–ABMT's safety and efficacy. In particular, Dr. Beveridge referred to published studies from Duke University Medical Center, Johns Hopkins University, Harvard Medi-

**9.** Dr. Beveridge, in response to the Court's question whether FDA approval was conditioned on a specific dose levels, testified that he had no knowledge of such a condition and that he believed that any FDA dose recommendation was not binding. No other witness testified to the contrary.

cal School, and the University of Chicago Medical Center as comprising an adequate basis for evaluating the safety and efficacy of HDCT–ABMT therapy. Dr. Beveridge also explained that much of the published HDCT–ABMT data is outdated owing to the substantial lag time between a study's completion and its publication. Current results, he stated, are even more encouraging than is reflected in the existing literature.

Dr. Beveridge also concluded that HDCT–ABMT satisfies criteria 3 and 4, which require a demonstration of a net beneficial effect on health outcomes that is as safe and efficacious as other existing treatments. He noted that, in contrast to standard chemotherapy, which produces only a tumor response rate of 50%[10], current data on HDCT–ABMT treatment reflects an 85% to 90% response rate. He also cited studies on high-risk patients with metastatic breast cancer that reflect tumor shrinkage as a result of HDCT–ABMT treatment. Tumor shrinkage, in his expert opinion, typically leads to a net beneficial effect on health outcomes. Specifically, he stated that HDCT–ABMT would likely lead to a median survival rate[11] better than the twelve months associated with standard dose chemotherapy without ABMT. In support, Dr. Beveridge described a 24–patient Johns Hopkins University HDCT–ABMT study that demonstrated a 67% survival rate at 17 months.[12] In a similar study of 49 patients at the University of Chicago, HDCT–ABMT resulted in a median survival rate of 20 months and a 20% survivorship rate at 3 years.[13] A 1989 Duke University study further corroborated these results; it demonstrated a positive response rate of 80% in patients with Stage IV metastatic breast cancer. Of the 54 patients treated, as of March 13, 1990, only 5 patients had relapsed. According to Dr. Beveridge, HDCT–ABMT's efficacy is sufficiently well-established, that it is the "generally accepted practice for young ..., premenopausal, high-risk patients with Stage IV cancer in Northern Virginia" and has been routinely prescribed since approximately 1988. The authors of one study cited by Dr. Beveridge stated that,

> The response of human breast cancer to drugs and radiation is dose-dependent, with higher doses producing increased response rates ... We evaluated 172 patients who received single or multiple drug chemotherapy, radiation, or both. The overall response rate was 58% ... *These data suggest that high-dose therapy and bone marrow autotransplants can produce remissions in patients with advanced breast cancer unresponsive to conventional therapy.*

Antman, K., Advanced Breast Cancer: High–Dose Chemotherapy and Bone Marrow Autotransplants, *Annals of Internal Med.* 570 (1988) (emphasis added). This fits plaintiff's case perfectly as she is a patient "with advanced breast cancer unresponsive to conventional therapy."[14]

Blue Cross cited HDCT–ABMT's 100 day 5—10% treatment mortality rate[15] as evidence that the treatment is neither as safe nor as efficacious as existing treatments. As Dr. Beveridge's testimony shows, this

---

10. Response rate is the degree to which a tumor ceases to grow or decreases in size.

11. Median survival rate is defined as a 50% survival rate after a specified period of time.

12. Dr. Colley and Dr. Beveridge disagreed sharply over the results of this study's data, disputing the correct interpretation of a graph of the results. In response to questioning by the Court, Dr. Beveridge testified that even if his interpretation of the data were incorrect, his conclusion that HDCT–ABMT is not experimental would remain unchanged.

13. This study's initial findings are published in Williams, S.F. and Bitran, J.D., *J. of Clin. Oncol.* (December 1989).

14. *See also* Williams, S.F., High–Dose Consolidation Therapy with Autologous Stem Cell Rescue in Stage IV Breast Cancer, *J. of Clin. Oncol.* 1824 (December 1989) ("The treatment approach of [HDCT–ABMT] ... can lead to an improved CR [complete response] rate in stage IV breast cancer.").

15. The 100 day treatment mortality rate is the percentage of patients who die as a direct result of medical treatment within the first 100 days after the commencement of treatment and not directly as result of the disease for which they are being treated.

argument, in context, is unpersuasive. To begin with, Dr. Beveridge explained that HDCT–ABMT's mortality rate is actually closer to 4%, based on recent data and ongoing studies at Duke Medical Center, Johns Hopkins Medical Center, and Fairfax County Hospital.[16] This is significant according to Dr. Beveridge, because standard chemotherapy without HDCT–ABMT, which is routinely covered by Blue Cross, has approximately a 7—9% treatment mortality rate over 100 days. But he acknowledged that a 10—15% range is typically represented to the community and to prospective patients as a generalization to account for patients' varying risk factors, such as age. Even assuming the treatment mortality rate for HDCT–ABMT is as high as 10—15%, such a rate would not, in Dr. Beveridge's opinion, render the treatment experimental. For patients who have only a 50% chance of surviving 12 months, Dr. Beveridge testified that a 10—15% risk of death from treatment and an 80—90% chance of tumor shrinkage from treatment does not necessarily make the procedure unsafe or ineffective.[17] Dr. Beveridge did acknowledge, however, that at some point, a treatment's mortality rate could become sufficiently high, depending on the disease, to render the treatment experimental. But this, he testified, is not the case with HDCT–ABMT.

Finally, with respect to Blue Cross criterion 5, Dr. Beveridge stated that the results from HDCT–ABMT, outside the research setting, are "guaranteed." Further, he rebutted the Blue Cross argument that the use of protocols in connection with HDCT–ABMT treatment is an indication that the treatment is experimental or inappropriate for use outside of the research setting. Protocols, he testified, are used in connection with many well-established, non-experimental medical treatments, such as the administration of antibiotics and the treatment of colon cancer, in a continuing effort to update medical knowledge and improve treatment. Use of a protocol does not, by itself, indicate that a procedure is experimental.[18] Were this not so, much of medicine might be swept within the ambit of the experimental exclusion provision as there is ongoing investigation across the whole range of medicine, including many well-established treatments. *See Reilly*, 846 F.2d at 424 (7th Cir.1988) (expert witness testified that "medicine … is always investigational and experimental in the sense that we have a potential for doing better and should investigate that potential"). In the case of HDCT–ABMT, according to Dr. Beveridge, the protocol's disclosures are intended to afford the patient the opportunity to give her or his informed consent to undergo the treatment and to participate in the study. And, as is true with other non-experimental, accepted treatments, a research protocol is used in the continuing effort to gather data so that the treatment can be refined and improved.

Blue Cross relies heavily on the absence of phase III studies relating to the efficacy of HDCT–ABMT. This reliance is misplaced. To begin with, nothing in the Plan requires that a treatment be the subject of completed phase III studies to escape the experimental treatment exclusion. Nor did Blue Cross offer any persuasive reason to read such a stringent requirement into the Plan. Many treatments become accepted without phase III studies, in part, it appears, because these studies, by their nature, are difficult to conduct. In general,

---

**16.** At Duke University Medical Center, one patient out of 20 died from treatment toxicity. One patient died out of the 44 total patients enrolled in the Johns Hopkins Medical Center and Fairfax County Hospital programs. Dr. William Peters, at Duke, represented to the Director of Blue Cross North Carolina that the patient toxicity rate associated with HDCT–ABMT has decreased over time to 0—10%.

**17.** Blue Cross' reliance on treatment mortality rate as a reason for denying coverage appears somewhat disingenuous, as Blue Cross, under other policies, does cover HDCT–ABMT treatment, despite its treatment mortality rate.

**18.** In support of this conclusion, Dr. Beveridge offered the example of testicular cancer. Chemotherapy is now the well-established therapy for testicular cancer. Yet, clinical investigative procedures continue. Dr. Beveridge explained that researchers are trying to evaluate whether it is possible to (i) reduce dose toxicity and (ii) increase chemotherapy dose efficacy.

phase III studies randomize patients and then administer a medical procedure to one group and a placebo to another, and finally compare the results. According to Dr. Beveridge, patients are reluctant to be randomized and to run the risk of being members of the placebo group. As an example, Dr. Beveridge pointed to a phase III study of HDCT–ABMT at Duke University that, for more than a year, has unsuccessfully attempted to accrue subject patients. Simply put, patients are unwilling to risk receiving the placebo treatment when ample evidence suggests that the true treatment will improve their conditions. Thus, the absence of extensive data comparing HDCT–ABMT treatment with a control group is relevant, but neither determinative nor ultimately persuasive of the treatment's status as an experimental medical practice.[19]

The testimony of Dr. Stanley Watkins, plaintiff's treating oncologist, echoed that of Dr. Beveridge. Dr. Watkins testified that plaintiff's best chance for long-term survival is HDCT–ABMT, which, in his opinion, is no longer experimental treatment for Stage IV metastatic breast cancer. He testified that he recommended HDCT–ABMT to plaintiff because it was the treatment that, in his opinion, "would afford her the longest life and the highest quality of life." Dr. Watkins explained that he based his conclusion primarily on data from Johns Hopkins University, with which he is affiliated as a clinical instructor, and other data compiled from around the country. Dr. Watkins also testified on the basis of his personal knowledge of the Johns Hopkins patients, many of whom he has treated or is currently treating during the post-transplant phase of their treatment. From his first hand experience, Dr. Watkins was able to state that there are HDCT–ABMT treated patients who are, as a result of the HDCT–ABMT, disease-free or still alive at a time past the point when he would have expected them to die had they received just standard dose chemotherapy. All of these factors led Dr. Wat-

kins to conclude unequivocally that HDCT–ABMT is not experimental.

In summary, the Court, having heard the testimony of Drs. Colley, Beveridge, and Watkins and having reviewed thoroughly all of the exhibits, concludes that on balance, Dr. Beveridge's and Dr. Watkins' conclusion that HDCT–ABMT is not experimental is well-founded. The evidence presented convincingly demonstrated the efficacy and safety of HDCT–ABMT treatment and its value in treating patients, like plaintiff, who suffer from Stage IV metastatic breast cancer. There is ample evidence that HDCT–ABMT results in tumor shrinkage and that tumor shrinkage correlates with increased survival. Further, given these favorable results, the treatment mortality rate is sufficiently low as not to call into question the treatment's safety. Thus, the Court concludes, on this record, that HDCT–ABMT is not experimental treatment excluded from the Blue Cross Plan.

Worth noting here is the modest breadth of this decision. It is not a green light signalling a general expansion of coverage under group health policies like the Plan. Rather, this decision is narrowly, but firmly, anchored in the specific expert medical testimony presented and in the terms and structure of the Plan's experimental exclusion provision. Of course, a different experimental exclusion, or different expert testimony, or a plan that conferred broad discretion on the administrator might well require a different result.

A related observation is equally noteworthy. Purveyors of quack remedies and fringe therapies should derive no comfort from this decision. HDCT–ABMT is neither of these. It is, instead, medicine's state of the art treatment for certain Stage IV metastatic breast cancer patients. It is used in medical centers around the country and provides plaintiff with her best chance for survival. What is especially significant is that HDCT–ABMT's status in this regard was established not through the testimony of ersatz or self-proclaimed healers

**19.** *See, e.g., Reilly,* 846 F.2d at 423–24 (7th Cir. 1988), where the court concluded, *obiter,* that an administrator's decision "to grant or deny coverage based solely on a success ratio per se" may be arbitrary and capricious.

or figures from the fringes of medicine, but through the testimony of two Board-certified specialists in the care and treatment of breast cancer.

For the reasons stated, the Court concludes that the Plan at issue covers HDCT–ABMT for plaintiff's Stage IV metastatic breast cancer. Accordingly, plaintiff is entitled to the declaratory relief sought. An appropriate Order has issued.[20]

---

**20.** After ruling for plaintiff from the bench, the Court noted, *obiter,* that Blue Cross' coverage denial decision would probably have survived review under an arbitrary and capricious standard. Because this issue was not squarely presented, the Court concludes, on reflection, that the issue would deserve more thorough consideration in the event this decision is reversed with respect to the standard of review. There is no doubt, however, that Blue Cross' position that HDCT–ABMT is experimental was asserted in good faith and was not insubstantial.