**Mary C. LEAHY, Plaintiff,**

v.

**THE BON, INC.; Allied Stores Corp.; and CIGNA Insurance Co., Defendants.**

**Civ. No. 89–NC–83B.**

United States District Court, D. Utah, C.D.

Aug. 31, 1992.

Brian R. Florence, Ogden, Utah, for plaintiff.

Deno G. Himonas, James S. Lowrie, Gary L. Johnson, Salt Lake City, Utah, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BENSON, District Judge.

1. The above-captioned matter came before the court for trial on June 5, 1992, at 8:30 a.m. Plaintiff was present and was represented by Mr. Brian Florence. Defendant CIGNA Insurance Co. was represented by Mr. Gary Johnson. Defendants Allied Stores Corporation and The Bon, Inc., (jointly "The Bon") were represented by Mr. James S. Lowrie and Mr. Deno G. Himonas.

2. The court heard evidence from the witnesses presented by the parties and all parties rested at the close of the day. No evidence was presented on liability for or amount of attorney's fees because the parties agreed to bifurcate attorney's fees issues.

3. Each party has submitted proposed Findings of Fact and Conclusions of Law to the court. The parties have waived their right to closing arguments. The court, being fully apprised in the premises, now enters the following:

## FINDINGS OF FACT

1. Mary Leahy started her employment with The Bon at its Layton location on March 12, 1986.

2. As part of the consideration for her employment, Mrs. Leahy received from The Bon certain benefits including the opportunity to enroll in optional employee benefit plans.

3. At the time Mrs. Leahy started her employment, a spouse and dependent children sign-up form was prepared for her designating her spouse as John T. Leahy and her dependent children as Maureen B. Leahy and Kathy A. Leahy. Mr. and Mrs. Leahy had other children, all of whom were emancipated.

4. Shortly after Mrs. Leahy started her employment, her daughter Kathy married. On May 15, 1986, Mrs. Leahy filled out an AETNA request record card designating her eligible dependents as John T. Leahy and Maureen B. Leahy.

5. Six months after her employment starting date, Mrs. Leahy became eligible for additional benefits referred to as "in-hospital cash" and "voluntary group accident" ("VGA") insurance. In this regard, Mrs. Leahy was given a letter generally explaining the benefits (Exhibit P–2) and a circular describing the VGA plan (Exhibit P–3) and the in-hospital cash benefits (Exhibit P–22).

6. The VGA plan was offered by Allied Stores Corp., the owner of The Bon. The retirement committee of Allied Stores serves as Plan Administrator. The insurance policy was issued by the Life Insurance Company of North America, a CIGNA company.

7. The VGA Plan entitled the employee to enroll in and purchase through payroll deductions, accident insurance which had coverage provisions for the employee, and at the employee's election, the employee's spouse and family. The coverage amounts ranged from $14,370 to $287,500 with premiums ranging from $.50 to $15 per month. (Exhibits P–2 and P–3.) Under the terms of the plan, 50% of the coverage amount would be paid in the event of the accidental death of a spouse.

8. The amount of coverage for which Mrs. Leahy originally applied is disputed in this action. Mrs. Leahy claims she originally subscribed to coverage in the amount of $215,620. Defendants claim that the Mrs. Leahy originally applied for coverage in the amount of $21,560.

9. Plaintiff submitted into evidence a copy of a CIGNA VGA Insurance Application Form. (Exhibit P–1). The original of this form cannot be located. In a box entitled "Amount of Principal Sum," a figure of $107,810 is crossed out with $215,-620 written above it. On the line entitled "Monthly Premium," a figure of $5.63 is

crossed out, with $11.25 written next to it. The form is signed by Mary C. Leahy and dated October 17, 1986.

10. There is conflicting evidence as to when this form was prepared. Mrs. Leahy testified that she filled out the form on October 17, 1986. She explained that in filling out her application, she used the information circular for guidance. Using the amounts contained in an example on page 3 of the circular, Mrs. Leahy first filled in the amount of $107,810 insurance coverage with a monthly premium of $5.63. After reading further and seeing a variety of alternatives described on page 4 of the circular, Mrs. Leahy changed her mind. She underlined on page 4 a principle sum insurance of $215,620 with a family plan monthly premium of $11.25 and changed her application to correspond to those figures. (Exhibit P–3).

11. On that same day, Mrs. Leahy also filled out the "in-hospital cash" benefits application. In reviewing the information circular, Mrs. Leahy underlined on the in-hospital cash information sheet, a daily benefit coverage of $70 for a family plan at a monthly premium of $23.73. (Exhibit P–22). She correspondingly filled out an application for those amounts. (Exhibit P–16).

12. Diane Doelfs, The Bon's store personnel assistant, testified that the VGA form was not prepared until 1988. She explained that Mrs. Leahy came to her in early 1988 complaining about a mistake that had appeared on her Benefits Profile sheet. At that point, Ms. Doelfs testified, Mrs. Leahy filled out a new application form, listing $215,620 as the coverage amount. The new form, it is alleged by Ms. Doelfs, was backdated to October 17, 1986. Ms. Doelfs further testified that Mrs. Leahy's file contained the original application form which showed a coverage amount of less than $215,620.

13. The court is persuaded by the testimony of Mrs. Leahy. Her explanation is the more credible. Her testimony as to how she filled out the VGA form, underlining the amounts in the circular, and then filling them in on the form, is consistent with how she filled out the in-hospital insurance form on the same day. Her testimony as to why she crossed out the original amounts on the VGA application is plausible in light of the way the information circular was written.

14. The court does not find the testimony of Ms. Doelfs to be convincing. If Ms. Doelfs was under the belief that there had been a mistake in the amount withheld from Mrs. Leahy's checks, why was a new application form necessary? Why wouldn't the original application be used to determine the correct amount? Why wouldn't Ms. Doelfs merely prepare a new computer input form consistent with the original application? Why did Ms. Doelfs allow Mrs. Leahy to backdate the application form to 1986? Why would she allow Mrs. Leahy to retroactively increase her coverage to $215,620, if, as Ms. Doelfs testified, the original form showed a lower amount of coverage?

15. The evidence and testimony presented persuade this court that Mrs. Leahy filled out a VGA application form on or about October 17, 1986, requesting insurance coverage in the amount of $215,620.

16. Beginning January 17, 1987, premium deductions for the VGA insurance were withheld from Mrs. Leahy's check in the amount of $1.13 per month. The $1.13 figure does not reflect a coverage amount of $215,620. Rather, it corresponds to coverage in the amount of $21,560.

17. The evidence presented does not establish conclusively why this discrepancy occurred. It was apparently due to a clerical error. From other evidence presented, (Exhibit P–8), apparently a second Mary C. Leahy was employed by The Bon in another location which had also resulted in some confusion with Mrs. Leahy's (the plaintiff's) retirement. This may have been the cause of the error in insurance coverage.

18. Defendants maintain that Mrs. Leahy was aware that her premium deduction was less than what was required for coverage of $215,620. The evidence showed that the premium deduction amount appeared on every other paycheck from January 1987 through February 1988. Further-

more, testimony was presented to show that Mrs. Leahy may have received "Benefits Profile" sheets detailing the amount of coverage to which Mrs. Leahy was entitled. The evidence showed that The Bon, in the normal course of operations, periodically generates Benefit Profile sheets and distributes them to its employees. The Benefit Profiles generated during 1987 show that Mrs. Leahy was entitled to VGA coverage of $21,560 at a premium of $1.13 per month. The Profiles also list Kathy A. Leahy as Mrs. Leahy's only dependent, despite the fact that Mrs. Leahy had designated her daughter Maureen as her only dependent in May of 1986.

19. Although defendants have shown Mrs. Leahy may have had an opportunity to discover the lower premium amounts, the evidence does not establish that Mrs. Leahy had actual knowledge of the lesser amount. Mrs. Leahy testified that she did not know about the coverage discrepancy until 1988. The VGA deduction was one of several categories listed on Mrs. Leahy's paycheck. At one point, she inquired of Ms. Doelfs about the purpose of the $1.13 deduction on her paycheck stubs. She received a general explanation that it was apparently tied to some of her life insurance benefits. Other than that, Mrs. Leahy testified that she paid no particular attention to the amounts or purposes of the premium deductions for that insurance or any of the others designated on her paycheck stubs.

20. Furthermore, although The Bon may have generated multiple Benefit Profile sheets during 1987, there is no evidence that Mrs. Leahy received these sheets, or that she looked at them and was aware of their contents. This is supported by the fact that Mrs. Leahy did not attempt to correct the beneficiary designation, replacing her daughter Kathy with Maureen, until February 1988 (see paragraph 24 below). Had Mrs. Leahy seen the Benefit Profiles before that time, she presumably would have made the correction earlier.

21. Thus, in spite of the fact that Mrs. Leahy received regular check stubs and may have received Benefit Profile sheets, the court finds that Mrs. Leahy did not know that her VGA premium deduction was less than the amount she originally requested in October of 1986.

22. In December of 1987, Mrs. Leahy's husband slipped on a patch of ice and struck his head, causing him severe brain damage. He was hospitalized and lapsed into a semi-coma.

23. Sometime in approximately February of 1988, Mrs. Leahy received a Benefits Profile sheet (Exhibit P–11) and a general explanation sheet addressed to "Bon Associates" explaining that the Benefits Profile sheet attached covered any benefit changes that had occurred during 1987. (Exhibit P–18)

24. At this point, Mrs. Leahy noticed that the VGA insurance coverage and premium amounts were wrong. She also noticed that her daughter Kathy, rather than Maureen, was listed as her dependent beneficiary. She then went to Ms. Doelfs and explained the problems with the Benefit Profile.

25. As explained above, the court finds that Mrs. Leahy did not prepare a new application form at this time. The more believable evidence suggests that Ms. Doelfs merely reviewed the earlier application of Mrs. Leahy and concluded there had in fact been a mistake. After examining Mrs. Leahy's file, Ms. Doelfs wrote the correct amount of $215,620 on Mrs. Leahy's January 18, 1988 Benefits Profile sheet (Exhibit P–11) and told Mrs. Leahy that it would be corrected and not to worry about it. This was the first time Mrs. Leahy realized the premium deduction from her pay had been in error.

26. There was conflicting evidence as to whether Mrs. Leahy offered to make up the delinquent premium amounts.

27. Ms. Doelfs was aware at the time the mistake in coverage was discovered that insurance amounts could not be increased except during an open enrollment period which was not available at the time. She had a discussion with her store manager who instructed her to "take care of it." Ms. Doelfs initiated the necessary keypunch form to change the amount of the

coverage because of the mistake. Accordingly, the next Benefits Profile sheet generated by The Bon bearing a print date of March 10, 1988, reflected the correct amount of voluntary group accident insurance of $215,620 with a monthly employee contribution premium amount of $11.25. The beneficiary designation was also changed eliminating Kathy Leahy and adding Maureen Leahy. (Exhibit P-10). Effective with the check of March 12, 1988, the correct premiums were withheld from Mrs. Leahy's pay.

28. On April 9, 1988, John T. Leahy, died from the injuries received in the accident.

29. Mrs. Leahy then submitted a claim to CIGNA Insurance Company through The Bon for benefits under the VGA Plan. (Exhibit C-12.) The claim was for an insurance death benefit of $107,810—50% of the $215,620 coverage.

30. Anthony Papidocka, a CIGNA employee, was assigned to adjust the Leahy claim. Mr. Papidocka received the application for death benefits, and supporting documentation, including the copy of the VGA application form dated October 17, 1986. Upon receipt of those documents, and the medical records, Mr. Papidocka requested additional information from the Bon, including evidence to substantiate that Mrs. Leahy's premium payments were made up to and including the date of the accident, and other documents such as the in-hospital cash enrollment. This information was requested in a letter to The Bon dated July 7, 1988. (Exhibit C-4)

31. On September 30, 1988, Ms. Doelfs sent to Mr. Papidocka a letter and copies of two Benefit Profiles for Mrs. Leahy. (Exhibit C-10) One benefit profile was dated November 13, 1987, and showed VGA coverage of $21,560. The second profile was dated March 10, 1988, and showed VGA coverage of $215,620.

32. The Bon undertook an investigation of the change in Mrs. Leahy's coverage amount. The results of the investigation were set forth in a November 18, 1988, letter signed by Karen Feltes, benefits administrator in the corporate headquarters for The Bon, and sent to Mr. Papidocka. The letter stated: "it has been verified that an unauthorized change was made to the VGA coverage amount...." (Exhibit C-5).

33. The letter further notes that in addition to the fact that the change was unauthorized, the difference in the premium level of $283.36 was never collected to pay for the higher coverage level. The letter concludes by stating that "it is clear to us that the coverage level of $21,560 which the employee has paid $1.13 per month for since November 2, 1986, up through March, 1988, is the legal and correct coverage level." (Exhibit C-5).

34. The November 18, 1988, letter was received by Mr. Papidocka and reviewed in conjunction with all the other documentation Mr. Papidocka had previously requested. CIGNA made its own review and examination of all the matters in the file.

35. CIGNA determined that there was coverage under the VGA Plan for Mrs. Leahy but that the appropriate death benefit to be paid to Mrs. Leahy by virtue of the death of her husband was to be based on an amount of $21,560, not $215,620 as requested by Mrs. Leahy.

36. On December 15, 1988, Mr. Papidocka sent a letter to Mrs. Leahy. The letter explained that available records indicated that at the time of her initial enrollment she had only opted for coverage of $21,560 and, accordingly, she was only entitled to one-half that amount. He enclosed CIGNA's draft for $10,780. (Exhibit P-4)

37. At no time prior to the December 15, 1988, letter was Mrs. Leahy informed that there was an investigation due to perceived irregularities in her insurance claim.

38. Mrs. Leahy then contacted Ogden Attorney Kenlon Reeve. Mr. Reeve wrote two letters protesting the denial of Mrs. Leahy's claim. Letters were sent to The Bon on January 25, 1989 (Exhibit P-14) and to CIGNA on January 26, 1989 (Exhibit P-15). Each letter included a copy of Mrs. Leahy's application form and explained her position about the higher coverage. They stated that the discrepancy in the coverage amount was apparently due to a clerical

error. Mr. Reeve requested compensation for the difference between the $10,780 sent to Mrs. Leahy and her entitlement of $107,810.

39. Mr. Reeve received a response from CIGNA by letter dated February 10, 1989 (Exhibit C–9). CIGNA rejected Reeve's request for full payment of benefits based on a coverage of $215,620. The letter advised him that CIGNA was relying on The Bon's finding that Mrs. Leahy had made an unauthorized increase in coverage in 1988. The letter also informed him of a right to request a review of the denial of the additional coverage.

40. Mr. Reeve also received a letter from The Bon's attorney, Kevin J. Hamilton. The letter explained the Bon's belief that Mrs. Leahy had wrongfully attempted to increase her coverage during the time immediately preceding her husband's death. The letter also explained that under the terms of CIGNA's insurance policy, a clerical error would not affect Mrs. Leahy's coverage. It suggested that Mrs. Leahy direct her appeal efforts toward CIGNA. (Exhibit P–13)

41. Thereafter, Mrs. Leahy contacted Ogden attorney James Z. Davis who again communicated with The Bon. Mr. Davis received a subsequent letter from Kevin J. Hamilton dated June 21, 1989, denying that any clerical error had occurred and informing her that any further dispute had to be resolved with CIGNA. (Exhibit P–12) Neither letter from Mr. Hamilton suggested or informed Mrs. Leahy of any review rights that might otherwise be available to her internally through The Bon.

42. This action was filed by Mrs. Leahy on October 6, 1989.

43. Both defendants, The Bon and CIGNA, have contended that the plaintiff's action should be dismissed because of her failure to pursue the administrative remedies available to her.

44. However, the court finds that there is some confusion as to the proper procedure for pursuing the administrative remedies. The Bon produced as evidence a brochure entitled "Voluntary Group Accident Insurance Plan," published by Allied Stores Corporation. On page 10 of the brochure, the procedure for appeal is explained. The brochure states: "If your claim has been denied in whole or in part, you or your beneficiary may appeal the denial and receive a review by the Plan Administrator." (Exhibit A–22, at p. 10). The brochure lists the plan administrator as The Retirement Committee of Allied Stores Corporation. (*Id.* at p. 2).

45. Similarly, another Allied Stores brochure, entitled "Your Bon Benefits," states: "You can have a denied claim reviewed if you like. Just notify the Retirement Committee (page 46) in writing, within 60 days of receiving the denial notice…." (Exhibit A–2, at p. 41).

46. Mrs. Leahy testified that she had a copy of "Your Bon Benefits" in her possession, and that she was familiar with its terms. However, there is no evidence that she ever received a copy of the VGA plan brochure.

47. Mary Ritzman, the benefits administrator for The Bon at the Seattle office, testified that any letters disputing coverage would automatically be forwarded by The Bon office to the Retirement Committee and be considered an appropriate appeal.

48. There is no evidence The Bon ever processed either of the letters from Mr. Reeve or Mr. Davis as an appeal or otherwise informed Mrs. Leahy of her right for a review before the Retirement Committee. Instead, the Bon encouraged Mrs. Leahy to direct her appeal efforts toward CIGNA.

49. Similarly, CIGNA's February 10, 1989, letter made no mention of any appeal rights through the Bon. That letter stated: "A request for review of this denial may be made in writing to the LINA representative signing this letter. The written request for review must be sent within 60 days of receipt of this letter." (Exhibit C–9).

50. At trial, evidence was presented of a CIGNA policy that appeals from denied claims are not handled by the same claims adjustor who originally denied the claim. However, there was no evidence that Mrs.

Leahy was aware of this policy. In fact, CIGNA's letter to Mrs. Leahy stated that her request for review should be submitted to Anthony Papidocka—the same adjustor who denied her claim in the first instance.

51. Nothing in the brochures or letters submitted by The Bon and CIGNA indicates to the insured that failure to exhaust internal remedies will result in forfeiture of the right to file suit for denial of benefits.

52. In fact, the VGA plan brochure states:

> If you or your beneficiary have a claim for benefits which is denied or ignored, in whole or in part, you or your beneficiary may file suit in a state or federal court.

(Exhibit A–22, at p. 11).

53. Similarly, the "Your Bon Benefits" brochure states: "If your claim for benefits is improperly denied or ignored, in whole or in part, you may file suit in a state or federal court." (Exhibit A–2, at p. 49).

## CONCLUSIONS OF LAW

1. The claims of plaintiff Mary Leahy in this action are subject to the Employee Retirement Income Security Act, 29 U.S.C. 1001, et seq. ("ERISA"). See August 14, 1991 Order (Winder, J.) and June 3, 1992 Order (Benson, J.).

### Waiver

■ 2. Defendants argue that Mrs. Leahy has waived her right to claim, or is estopped from claiming, coverage in excess of $21,560. They assert that the premium amount paid by Mrs. Leahy only entitles her to coverage in that amount. They stress that Mrs. Leahy received numerous check stubs showing the lesser premium deduction amount, but that she failed to do anything to correct the problem. Thus, it is argued, even if Mrs. Leahy originally requested a higher coverage amount, she has waived her right to that coverage through her inaction.

3. Waiver is the voluntary, intentional relinquishment of a known right. It must be distinctly made. *See Hunter v. Hunter,* 669 P.2d 430, 432 (Utah 1983). In the present case, Mrs. Leahy did not know of the discrepancy between the premium amount deducted from her check and the amount requested by her on the VGA application form. Under these circumstances, her failure to increase the payment amount is understandable. Her inaction cannot be deemed an intentional relinquishment of her right to the higher coverage amount. Accordingly, Mrs. Leahy did not waive her claim for those benefits.

4. Similarly, Mrs. Leahy's claim is not barred by the doctrine of estoppel. The court finds that Mrs. Leahy's conduct was not such that it would be inequitable to allow her to assert her right to the higher coverage amount.

### Exhaustion of Remedies

■ 5. Defendants assert that Mrs. Leahy may not assert her claim in federal court because she has failed to exhaust the internal administrative remedies of the ERISA plan. They cite to *Held v. Manufacturers Hanover Leasing Corp.,* 912 F.2d 1197 (10th Cir.1990) for the proposition that "exhaustion of administrative (i.e., company- or plan-provided) remedies is an implicit requisite to seeking judicial relief." *Id.* at 1206.

6. In this case, however, it is not clear what internal remedies were available to Mrs. Leahy. Defendants supplied Mrs. Leahy with conflicting information. The letters sent to Mrs. Leahy after the denial of her claim stated that she should pursue her claim through CIGNA. The VGA insurance plan booklet and the "Your Bon Benefits" brochure stated that denied claims would be reviewed by the Retirement Committee of Allied Stores Corporation. The brochures also stated that denied claims could be pursued in state or federal court. Nothing in the information supplied to Mrs. Leahy prior to her filing suit indicated that the exhaustion of internal remedies was mandatory.

7. Thus, Mrs. Leahy was not put on proper notice of the internal appeal process, and was not informed of the mandatory nature of administrative appeal. Under

such circumstances, it would be unjust to strictly assert all of the technical requirements of internal administrative review against Mrs. Leahy.

8. Furthermore, it is clear that Mrs. Leahy did attempt to pursue her claim internally. She made her initial claim through CIGNA in 1988. She followed up with a January 26, 1989, letter to CIGNA contesting the denial of her claim. CIGNA rejected both of Mrs. Leahy's attempts to receive the higher coverage.

9. Mrs. Leahy also made two attempts to contest the denial of her claim through The Bon. This action comports with the appeal process set forth in the VGA plan booklet and in the "Your Bon Benefits" brochure. Mrs. Leahy's letters were an attempt to appeal the denial of her claim internally. Such letters, according to testimony, were ordinarily forwarded to the Retirement Committee and treated as an appeal. Thus, these letters are equivalent to an internal appeal consistent with the appeal process set forth in the VGA plan.

10. The court finds that Mrs. Leahy, in making three attempts to contest the denial of her claim, exhausted her internal administrative remedies under the ERISA plan.

11. Alternatively, even in Mrs. Leahy failed to comply with all of the technical requirements of internal appeal, the court finds that additional attempts for internal review would have been futile.

12. Mrs. Leahy had supplied the defendants with all of the essential relevant evidence to support her claim. Both defendants received a copy of the October, 1986, VGA application form, together with Mrs. Leahy's stated belief that an apparent clerical error had taken place.

13. Further attempts at appeal through CIGNA would have been futile. Mrs. Leahy had received two letters from CIGNA denying her claim. Each letter was signed by Anthony Papidocka. The second letter informed her that any further requests for review should be sent to Mr. Papidocka. Nothing in CIGNA's communications with Mrs. Leahy indicate that additional appeals would be submitted for independent review.

14. CIGNA made it clear that it was relying on The Bon's factual finding of an unauthorized change in coverage. CIGNA enclosed a copy of a November 18, 1988, letter from The Bon, which stated that an unauthorized change had been "verified."

15. Accordingly, Mrs. Leahy understandably shifted her efforts toward persuading The Bon that there had been a clerical error. The Bon rejected both of these attempts. There is no evidence that either of her letters were forwarded to the Retirement Committee, or that they received additional consideration as appeals.

16. Faced with this situation—Cigna's reliance on The Bon's factual findings, and The Bon's refusal to alter those findings—it is clear that further attempts at internal review would have been futile.

17. Accordingly, the court finds that this action is not barred for failure to exhaust administrative remedies.

### *Standard of Review*

18. The standard of review for suits challenging the denial of benefits under ERISA was set forth by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There, the Court stated:

> [W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id.* 489 U.S. at 115, 109 S.Ct. at 956. In the present case, the VGA plan did not give defendants discretionary authority in making benefit eligibility decisions. Thus, the decision to deny Mrs. Leahy benefits under the plan appears to be subject to *de novo* review.

19. However, despite the Supreme Court's holding in *Bruch*, defendants urge this court to apply a deferential standard in reviewing the denial of Mrs. Leahy's benefit claim. They attempt to draw a distinction between cases where the decision-maker engages in plan interpretation, and those

where it engages in factual determinations. Defendants assert that *Bruch* only applies to actions involving the interpretation of plan terms. Factual determinations, it is argued, should be given deference by the reviewing court.

20. The application of the *Bruch de novo* standard of review to factual determinations is in conflict among the courts. Defendants cite to several cases where courts have limited *Bruch* to actions involving plan term interpretation. In these cases, courts have applied an arbitrary and capricious or an abuse of discretion standard to the factual findings made by the plan administrator. *See, e.g., Pierre v. Connecticut General Life Ins. Co.,* 932 F.2d 1552 (5th Cir.) *cert. denied,* — U.S. ——, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991); *Barish v. UMWA Health & Retirement Fund,* 753 F.Supp. 165 (W.D.Pa.1990); and *Questech, Inc. v. Hartford Accident & Indem. Co.,* 713 F.Supp. 956 (E.D.Va.1989).

21. Other courts, however, have found that the *Bruch de novo* standard of review applies to both factual and term interpretation decisions. *See, e.g., Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176 (3rd Cir.1991); *Petrilli v. Drechsel,* 910 F.2d 1441 (7th Cir. 1990).

22. Defendants have cited no Tenth Circuit cases dealing with this issue.[1] It is not clear whether the Supreme Court or the Tenth Circuit would give any deference to the factual findings of an ERISA plan administrator.

23. However, it is this court's opinion that in determining whether to give any deference to the determinations made by plan fiduciaries or administrators, the court must take into account a very important factor—the impartiality of the decision-maker. If the decision-maker has a stake in the outcome of its decision, the impartiality of the decision is inherently suspect. Therefore, the reviewing court must consider the existence of a possible or actual conflict of interest in reviewing the decision. This factor is relevant to both the standard and scope of review.

24. The Supreme Court discussed this issue in its *Bruch* decision. There, the Court found that considerations of impartiality are not relevant in reviewing plan interpretation decisions. Such decisions are subject to *de novo* review whether or not there is a conflict of interest. However, the Court recognized that impartiality concerns may be relevant in other circumstances. The Court found that where the plan gives discretion to the decision-maker, conflict of interest is a relevant factor in determining whether the decision-maker abused its discretion. *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956.

25. Similarly, it is this court's opinion that conflict of interest is a very important factor to consider in determining the standard of review to be applied to the factual findings of the decision-maker. When a conflict of interest exists, the findings of the decision-maker are suspect. Accordingly, no deference should be given when reviewing those findings. To hold otherwise would allow a decision-maker to advance its own interests at the expense of the employee beneficiary. Denied claims would be immune from attack, absent a showing of abuse of discretion or arbitrariness and capriciousness. Such a holding "would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.*

26. Thus, this court holds that where a decision-maker (who has not been given discretion under the plan) has a conflict of interest, its factual determinations should be given no deference. Such findings are subject to a *de novo* standard of review.

27. Alternatively, this court finds that if factual determinations are to be given deference, the conflict of interest and

---

1. Defendants argue that *McGee v. Equicor–Equitable HCA Corp.,* 953 F.2d 1192 (10th Cir.1992) indicates by inference that *Bruch* is limited to plan interpretation. However, the court finds this case to be inapposite. The review given to a physician's exercise of medical judgment does not necessarily correspond to the review given to the factual findings of a plan administrator who has been given no discretion under the plan.

impartiality of the decision-maker should be a strong and relevant factor when determining whether the decision-maker has abused its discretion or has acted arbitrarily and capriciously.

28. In the present case, defendants have an apparent conflict of interest in the denial of Mrs. Leahy's claim. Each defendant stood to gain from the determination that Mrs. Leahy had made an unauthorized change in her coverage amount and was therefore not entitled to the higher benefits. CIGNA, as the insurer, has a financial interest in every claim decision. Every dollar denied to the beneficiary is retained in the company—thereby increasing its profits. The Bon, as the plan administrator, also had a stake in the outcome of the decision. It was Mrs. Leahy's contention that the discrepancy in coverage was due to a clerical error. Under the terms of the ERISA plan, such an error would not have prejudiced Mrs. Leahy's beneficiary interests. However, if the discrepancy was caused by a mistake of The Bon, it might have exposed The Bon to liability.

29. In summary, this court finds that the denial of Mrs. Leahy's benefits should be reviewed under a *de novo* standard. Under *Bruch*, when the ERISA plan gives no discretion to the decision-maker, a *de novo* standard of review is appropriate.

30. Furthermore, even if *Bruch* does not apply to factual determinations, the existence of an apparent conflict between the interests of the defendants and the insured convinces this court that the defendants' factual findings should be subject to *de novo* review.

*Scope of Review*

31. Defendants argue that in reviewing a claim for denial of benefits under ERISA, the district court is limited in the evidence it may consider. The court, it is argued, may only consider that evidence which was before the decision-maker at the time of the denial.

32. The Circuit Courts are divided on this issue. The Eleventh Circuit in *Moon v. American Home Assur. Co.*, 888 F.2d 86 (11th Cir.1989) found that the reviewing court is not limited to the evidence available to the decision-maker. Such a limitation, the court reasoned, "is contrary to the concept of a *de novo* review." *Id.* at 89. *See also Luby*, 944 F.2d at 1184–85.

33. The Sixth Circuit, however, disagrees with the *Moon* decision. In *Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir.1990), the court found that review of the decision must be limited to the record before the decision-maker. *Bruch*, the court reasoned, did not require a *de novo* hearing to obtain new or additional evidence. Instead, the court found that "the *de novo* review required by *Bruch* is a *de novo* review of the record before the administrator or fiduciary." *Id.* at 965.

34. The Tenth Circuit has not ruled directly on this issue. However, in *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452 (10th Cir.1991), the court suggested it agrees with the analysis of *Perry*. In *Woolsey*, the court reviewed the decision of a plan administrator under an arbitrary and capricious standard because the ERISA plan gave discretionary power to the administrator. In reviewing the decision, the court cited *Perry* for the proposition that the court should consider only those facts which were before the plan administrator at the time of the decision. *See id.* at 1460.

35. Thus, where the ERISA plan gives discretionary power to the decision-maker, the reviewing court is limited to the evidence in the record before the plan administrator. It is unclear whether this limitation applies when the decision is subject to *de novo* review.

36. If such a limitation is to be imposed, however, it is this court's opinion that the court must consider other relevant factors before limiting its review of the available evidence. For example, courts must look to whether the plan administrator and fiduciary made reasonable efforts to obtain all of the relevant evidence before making the decision. There may be circumstances where it would be unreasonable for the decision-maker to make a determination without obtaining more evi-

**540**

dence. If a decision-maker has been arbitrary and capricious in not obtaining additional evidence before making its decision, the court should not be limited to the evidence considered by the decision-maker.

37. Similarly, as discussed above, courts should consider whether the decision-maker has a conflict of interest. Where the decision-maker stands to gain from a denial of benefits, there may be incentive to base the denial on less than all of the available evidence. Under such circumstances, courts should be hesitant to limit the scope of review to the evidence considered by the decision-maker.

■■ 38. In the present case, the court finds that defendants acted arbitrarily and capriciously in not seeking additional evidence before making the decision to deny Mrs. Leahy's claim. Mrs. Leahy supplied defendants with compelling evidence to support her claim—the copy of the VGA application form dated October 17, 1986. This document, on its face, is evidence that Mrs. Leahy was entitled to the higher amount of coverage.

39. The Bon allegedly conducted an investigation, but it did not investigate the circumstances surrounding the creation of the VGA application form. It made no attempt to get Mrs. Leahy's side of the story. It determined that the change in coverage was "unauthorized," but did not determine whether it was warranted under the circumstances. Similarly, CIGNA was arbitrary and capricious in placing such heavy reliance upon The Bon's investigation, especially when The Bon had a conflict of interest in the matter. CIGNA received all of Mrs. Leahy's relevant evidence but it rejected this evidence out of hand, without seeking to follow up on Mrs. Leahy's position.

40. Accordingly, because defendants had a conflict of interest in this matter, and because defendants were not reasonable in denying the claim without further investigation, the court finds that it is not limited to the evidence available to the decision-maker. The court is entitled to consider the position of Mrs. Leahy, and the testimony concerning the creation of the VGA application. Such evidence would have been available to defendants had they attempted to investigate Mrs. Leahy's claim further.

*The Denial of Leahy's Benefit Claim*

■■ 41. Based on a *de novo* review of the full record, it is this court's conclusion that the decision to deny Mrs. Leahy's benefits claim was erroneous. Mrs. Leahy requested VGA insurance coverage of $215,-620 in October of 1986, and was entitled to coverage in that amount. She is entitled to that coverage despite the fact that she did not pay the appropriate premium amount before the accident. The error in premium deduction was not the fault of Mrs. Leahy. It should not prejudice her rights to the requested benefits. This comports with the terms of the insurance policy, which states that a clerical error would not reduce the benefits due to the employee beneficiary.

42. Although this finding has been made under a *de novo* standard of review, the outcome would not change if the court were to apply a more deferential standard. Defendants' determination that Mrs. Leahy was not entitled to the claimed benefits was an abuse of discretion and was arbitrary and capricious. Defendants received a copy of Mrs. Leahy's original application form. This form clearly showed a request for coverage in the higher amount as of October, 1986. The form was accompanied by Mrs. Leahy's explanation that an apparent clerical error had occurred. Under these circumstances, it was arbitrary and capricious to deny Mrs. Leahy's claims without giving consideration to her position. This conclusion is given additional support when the decision-maker's conflict of interest is considered as a factor in determining whether defendants abused their discretion.

43. Similarly, this court's finding would not be different if it limited the scope of review to that evidence which was before defendants when the original denial was made. The evidence presented at trial was not substantially different from that available to defendants. Mrs. Leahy's primary

argument (that she had requested the higher coverage amount in October of 1986, and that the discrepancy in the premium deduction amount was apparently due to a clerical error) had been presented to defendants. The trial merely reiterated Leahy's position in greater detail.

44. Thus, a *de novo* review of the record available to defendants at the time of decision would result in the same conclusion reached by the court today—that Mrs. Leahy is entitled to benefits based on coverage of $215,620.

45. Accordingly, this court finds that under the terms of the plan, Mrs. Leahy is entitled to 50% of the coverage amount ($107,810) as a result of her husband's accidental death. Because Mrs. Leahy has only received $10,780 in benefits, she is entitled to an additional $97,030. This amount should be reduced by $283.36, the amount of additional premiums which Mrs. Leahy would have paid but for the clerical error. Accordingly, it is the ruling of this court that Mrs. Leahy is entitled to ERISA benefits of $96,746.64 plus interest.

IT IS SO ORDERED.